and I represent Karlanda, Meadors, and four other independent-minded voters in this constitutional challenge to New York's early petition deadline for independent candidates. Before inviting your questions, I want to try to make one important point. This case, like Anderson v. Salabrisi, is about the First Amendment rights of independent and moderate voters. New York's independent petition deadline left tens of thousands of Buffalonians without a choice on the ballot in the 2021 mayoral election, and that's precisely the First Amendment harm that Anderson v. Salabrisi seeks to prevent. Now, despite what Erie County will tell you— Before we get to sort of the merits question, can I just ask about standing? So the injury that your client suffered is ostensibly the inability to vote for the candidate of their choice, is that right? The injury that my client suffered is precisely the same injury that was suffered by the voter plaintiffs in Anderson v. Salabrisi. So yes, it is a First Amendment harm. But they did, in fact—they were allowed to, and they did, in fact, vote for the candidate of their choice, right? Through a write-in. Through the write-in process? Yes. I understand that. And that was an issue in Anderson— What is the injury? What is the injury? The injury is not having the choice on the ballot. The Supreme Court addressed the write-in issue. Yeah, I know, but Anderson himself was a party in that case. So I kind of see how the candidate himself is injured by not appearing on the ballot as opposed to having to conduct a write-in campaign. But the voter—the voter's injury is not being able to vote for the candidate of his or her choice. And here the voters did get to vote for the candidate of his or her choice, unless there's some allegation they were unable to write the name or something like that. But there's no allegation to that effect. And so the difference between having to do it as a write-in or having the person appear on the ballot doesn't seem to be an injury to the voter, unless you were to say, well, it means that my favorite candidate was less likely to win because he didn't appear on the ballot. But it can't possibly be that just because I favor a candidate, I'm injured by any kind of procedure or any kind of, you know, aspect of the campaign that makes it less likely for my favorite candidate to win, right? My response would be, again, that the Supreme Court addressed that issue from the voter's perspective in footnote 26. Footnote 26 refers to the earlier case of Lubin v. Panish. And that case specifically traces the injury to the voter in the voter wanting to have choices on the ballot from which to choose. And so I... Well, let me ask you this. With respect to the relief you all were seeking for 2021, that cannot be given. So the case is moot as to the 2021 election. Your case is based on the capable of repetition evading review argument, right? Yes, Your Honor. Exact same as Anderson. All right. But in 2021, there's no longer a claim with respect to that. Anderson v. Celebrezzi was decided in 1983. I understand. Just stay with my question. Sure. Okay? And the question is, am I right that your claim now depends on arguing that this injury is capable of repetition but evading review? That is correct. Okay. Now, in... Bear with me. In FEC v. Wisconsin Right to Life, the Supreme Court did say that there has to be a reasonable expectation that at some point in the future, plaintiffs, the voters now, would again seek to vote or support such a candidate, that is a candidate who lost the primary election and could not get on the ballot because the non-party line processes have to be completed before the primary election, right? That's what has to be capable of repetition but evading review. I think I'd phrase it slightly differently, Judge. It's simply that my clients are independent-minded voters and there's a reasonable expectation that they might want to vote for someone in a future election who decided to run after the early deadline. Well, why is it, though, that given that there's always going to be some deadline, why is it that they're likely to seek to support a candidate in the circumstances that you've got here? Well, New York's deadline is the third earliest in the country. It is not at all inconceivable that there could be candidates who decide to run in reaction to developments over the course of the campaign. Well, let me ask you this. If there were two weeks before the primary, would you still have the same argument because your candidate would lose the primary and the time to get on the ballot as a non-party candidate would have expired before you knew that? I'm not sure I heard the first part of your question. You're asking me if the deadline were two weeks instead of four? I'm trying to figure out if any deadline before the primary is unconstitutional in your view. That is not exactly our view. Our view is that any deadline that occurs before the primary election would be discriminatory and then would have to be justified by an appropriate interest. The Supreme Court makes very clear in Anderson that there are no bright lines here. There's no substitute for the hard judgments that must be made. What is the authority for your argument that any deadline before the primary is discriminatory? That would be Anderson versus Celebrezzi. Well, what in Anderson versus Celebrezzi supports that conclusion that any deadline beforehand before the primary is discriminatory? The Supreme Court's discussion of Ohio's deadline in that case leaves a very clear impression and has been followed, cited as such by numerous other courts that a deadline... In New York, you can do both, right? In New York, you can both run for the primary and hedge your bets by also getting on as a non-primary candidate, right? New York has position voting. Doesn't that alter some of the reasoning you're relying on? I mean, you're saying your clients just don't want to have to go through both processes. My clients are independent-minded voters who are dissatisfied with the far-left candidate nominated by the Democratic primary. And they have a right, with five months left before the election, they have a right to... But what is the right to wait until the primary is conducted? That's what I'm having trouble understanding. Why do they have a right to wait until the primary is conducted? Well, my clients are not candidates. They did not wait for anything. They simply were unsatisfied, dissatisfied. Is it reasonable to have some deadline? There must be some lead time so they can print up the ballots, et cetera. Of course, Your Honor. And the deadline... And you think four weeks is unreasonable. I guess, to follow up on Judge Radji's question, would two weeks be unreasonable? Well, you asked about the ballot printing deadline. I'm just saying there's some practical reasons to have a deadline. And I'm just trying to find out from your client's perspective what would be reasonable if four weeks is too long? Three weeks? Two weeks? So four weeks is just the time before the primary election. The ballot printing deadline is about 100 days after the petition deadline. Well, you still need printing for the primary, don't you? No, you do not, Your Honor. Independent candidates do not run in the primary election. That is why it's unjustifiable to have this deadline in May when they're seeking to be on the ballot in November. I didn't understand that. Help me out. Are you saying they can't run as independent candidates if they're also on the primary ballot? I didn't understand that to be New York law. No, Your Honor. What I'm saying is the deadline in May for independent candidates is to appear on the November ballot five months, more than five months later. Right? And you don't need five months to print those ballots. There's evidence in this record that Erie County does not need five months to check independent petitions and figure out who deserves to be on the ballot. The reason they have those deadlines is to facilitate the ballots sent to servicemen overseas and also to prevent people who lose in the primary from turning around and running as independent, right? So I understand that New York is one of only five states that allow fusion voting, right? So in all those 45 other states, you could not do what you're suggesting the First Amendment gives you a right to do. So are the laws in 45 states unconstitutional? No. Your Honor, this is not about fusion voting. This is about my clients who are independent candidates who want to vote for a candidate. I understand, but if they lived in a state that said that you can't run on a separate line if you competed in the primary of one party, you just can't. It's just flatly prohibited. They would not have the opportunity to do what you're suggesting, that they have a constitutional right to do. So you could make the same argument in all those other states, right? No, Your Honor. Let me be clear. If New York had a sore loser statute, my clients could not have coalesced around Byron Brown. They would have had to choose another candidate in Buffalo to coalesce around, but even that other candidate would not have been able to get on the ballot. That's why this case is not about Byron Brown. There is a right to have one's choice on the ballot. But other candidates can get on the ballot. They just have to meet this deadline, right? The right that's recognized in Anderson v. Celebrezzi is a right to have one's candidate on the ballot that is not, who doesn't face the early deadline. I mean, John Anderson is in virtually the same position as Byron Brown is here. I want to ask you two questions. First, a moment ago you said that New York did not need five months from the independent candidates to the general election. I understand their response to that to be it's not that the Board of Elections is doing nothing in the interim. It is supervising the primary elections. It is doing, getting the overseas ballots ready, et cetera. So that, I'd like to hear what your response to that is because it seems to me that undercuts your, well, it's like five months in which they're doing nothing, but, and could easily have dealt with these independent ballots. Why isn't their response that they have to make these sequential so that they can deal with all the different ballot questions they have? So my first response to that, Your Honor, is that the justification was subject to dispute and there is contradictory evidence in the record on that point. We depose Erie County's elections director and we laid that out at summary judgment. The other thing I would say. On that one, your answer is there are factual disputes about it. Let me ask my second question. Instead of holding the independent or making the independent deadline two weeks or four weeks before the primaries, what if it were the primary day? Thank you for that question. The way I would analyze that hypothetical is to say that under Anderson versus Salabrisi, there's no discrimination against independent voters in that circumstance. But there still could be a burden. Remember, the Anderson test is the character and the magnitude. That's a bi-dimensional test. Well, because here, I mean, the reality of this situation is your clients were burdened, as you put it, by not being able to vote in the general election for the primary loser. And if the independent candidate deadline were the day of the primary, wouldn't your clients be in exactly that situation? So if the No, first of all, is that right? That if the independent deadline were the day of the primaries so that everybody voted, either you want an independent candidate or you want a party candidate, your clients would have been in the same situation. They wouldn't have gotten to vote on the ballot for the primary loser. They would not have been able to coalesce around Byron Brown, that's for sure. And would that have been, would you be here complaining that they had suffered First and Fourteenth Amendment violations? We probably would. And let me give another hypothetical. Because, why? Help me understand. Let me give you a hypothetical to illustrate that. I'd rather stick with mine, but okay. Suppose the independent petition deadline is the same day as the primary, but the primary is in January before the November deadline. And thus, nobody can enter the race in January. I think under Anderson v. Celebrezzi, the analysis of that would be no discrimination. That's not our situation. No candidate, every candidate in the hypothetical I've given you, which I want you to stick with, has to be chosen by the same deadline date. Well, that was the case in my hypothetical, too, but there's a longer period. Well, let's stick with the New York one. Right. So, New York's deadline for independent candidates is the third earliest in the country. Now I'm hypothesizing for you that it would be the same date as the primary. Your client would have suffered the same injury. And it would still be the third earliest in the country. Most of the deadlines for independent candidates are much later. So, is that your gripe with New York, that all of this should be accelerated? Our issue is that the petition deadline is both discriminatory and that it's too early to cut off the opportunity to enter the race. The large number of voters in New York compared to many other states. I mean, when you say it's the third longest in the country, it's probably also one of the ten most populated states in the country, so the most voters. Well, but the number of voters doesn't, isn't reflected in the amount of time that it takes. You don't think that matters, how much time it takes to run an election, whether you're dealing with ten million people or you're dealing with one million people? That's not what the record evidence supports, Your Honor. The record evidence is that it would take Erie County less than a day to do a, to check the signatures on a petition. Yeah. I do want to emphasize. And the reason it's discriminatory is because the early deadline puts a burden on the independent candidates in order to achieve on the ballot. What is, what's the discrimination? So you don't deny that independent candidates can run for office, right? They just have to meet an earlier deadline. And what is there in the record that describes what that burden is? Where is it in the record? What is there in the record that describes the burden? On my clients? Yeah. So the evidence on which we relied at summary judgment includes the verified complaint? Judge Menasche's question was what is the burden? And my follow-up is what is the burden and what is the support in the record for that assertion? Gotcha. The Supreme Court in Anderson v. Celebre is the analyzing. If you come back to the case, we're asking you about the record. What is there in this record that tells us what the burden is and supports it? Because when you're looking, you've got the verified complaint, you have the expert's declaration, you have Mr. Brown's declaration. I'm not seeing much in those documents as to what the burden is on the plaintiffs. Okay. So I understood Judge Menasche's question to be about the discrimination and not about the magnitude of the burden. Let's do both. How is it discriminatory and what's the burden? Why don't you tell us both? So the petition deadline here is discriminatory in the same way that the Supreme Court described Ohio's deadline as discriminatory in that it gives party candidates the advantage of extra time to work things out, to develop the issues. That's cut off earlier for independent candidates than it is for political parties because of that 28-day, four-week gap. But that is not reasonable because you probably don't want to be an independent candidate until you see that you have to be and that you've lost the primary. And so it makes sense that there's a lag. Well, that's not how the Supreme Court analyzed it in Anderson v. Salabrisi. That's not how the Ninth Circuit analyzed it in Nader v. Brewer. We list a whole host of cases that have understood the Supreme Court's analysis of discrimination. Now, I want to be clear. That's not the end of the story. In Anderson v. Salabrisi, the Supreme Court faulted Ohio's filing deadline because it prevented persons who wished to be independent candidates from entering the significant political arena established by the state by a presidential election campaign. Mr. Anderson was looking to run as an independent. He was never looking to run in Ohio as either a Republican or a Democrat, right? No, that is inaccurate. He had entered Ohio's primary as a Republican. He had entered Ohio's primary as a Republican and withdrew. He had lost. And lost. Well, he had lost nine primaries on the Republican side before he withdrew and became an independent on April 24th, 1998. But are you saying he ran in Ohio as a Republican? Yes, he did. I'm sorry, I didn't see that in the record, but I'll look for it. I think that's in footnote two of the Anderson decision. All right. Okay, so you're saying there's this time lag? That's the discrimination? Yes. That's not the end of the story because I think New York could justify a discriminatory time lag if the deadline were late enough, if there were some administrative need for that. And we know that because that's exactly what the pre-2019 deadline was. The deadline was before. And they have to have a late deadline. Why? Why does it have to be late, only justified by administrative conveniences as opposed to other considerations? Well, that gets to the core of what Anderson is about. It is about the associational rights of voters like Karlanda Meaders. If you cut that off too early, as we saw in the 1980 presidential race, as we saw in the 2021 Buffalo primary, then voters who have First Amendment rights are left out in the cold. And that is what Anderson does. But you're basically saying the First Amendment requires each state to have a deadline as late as possible, as administratively feasible in order to maximize the number of independent candidates who can enter the race. Is that right? I wouldn't put it so strikingly, Your Honor. That doesn't say what you're saying, so how would you put it? So, again, the Anderson test is a totality of circumstances test. The Supreme Court says the results... ...to have as many independent candidates as possible, or even a plethora of them. The Supreme Court has explicitly recognized that the state has a compelling interest in political stability and limiting sore loser candidacies and simplifying the ballot. But the Supreme Court has never backed away from this conception of Anderson versus Celebrezee and the focus on the rights of independent voters. And the 2021 Buffalo race is a perfect example of why. Because tens, thousands of Buffalonians, the majority of the city, would have been completely disfranchised if there were only choice. Disfranchised by the rules, right? Like, so Byron Brown in prior years ran as a nominee not only of the Democratic Party, but the Working Families Party, the Independent Party, the Conservative Party, the Independence Party, and the Women's Equality Party, right? If he had filed his petitions and gone on the ballot, they would have had multiple choices. So what they're really objecting to is the idea that somebody who loses the Democratic, or what you're objecting to is that somebody who loses the Democratic Party can't turn around and then file a nominating petition. But if he had planned to do so all along, there would be the choices. Or if there were other candidates who wanted to run in Buffalo, if there were Republicans in Buffalo, they would have had other choices too, right? I mean, that is not something that the rules are creating. That is not, I think, an accurate statement of our case. Our, Byron Brown happened to be the candidate around whom my clients coalesced. But if they had coalesced around Jane Doe instead, who emerged post-primary, I think the issues would be a little clearer. And I think they would still have the right to do so. And that is what. How long before the general election can they have their deadline, the State of New York? So the old deadline. What's impermissible? I mean, I'm trying to figure out what you think is constitutionally required here. I think the State of New York has some flexibility. Most other states have their independent petition deadlines in July or August. That's in Appendix B to Richard Winger's declaration, which is in the appendix at page 188. Now, what is it required to send out their military ballots? Forty-five days. That's in mid-September. So the August deadline, the mid-August deadline that was pre-2019 gave New York plenty of time to check those petitions before the MOVE Act deadline. What's the principle that requires that? So if the voters, your clients, coalesce around Jane Doe in July, you're saying they should be allowed to submit petitions in July. But what if they coalesced around Jane Doe in September? What's the principle that says, well, July is constitutionally required, but September is not? The principle is the second and third piece of the Anderson test, that you have to balance the state's legitimate interests, right? There's no dispute about that, that the state has legitimate interests in election administration. Well, I mean, when the state of New York adopted this law, you know, they said it's not just to comply with the MOVE Act, but it's also to prevent sore loser candidacies. And they said it's actually a virtue that we have an earlier deadline for independent candidacies, because what that will mean is that independent candidacies are going to be about somebody who generally wants to run as an independent candidate, not somebody who loses the party primary and then turns around and wants to run as an independent. So they articulate that interest. It does seem consistent with what the Supreme Court has said, that states have interest in stopping sore loser candidacies and simplifying the ballot. So why isn't that an interest that we weigh against, you know, your purported interest in having independent candidacies that coalesce only well after the party primary? So I have two responses to that judgment, actually. The first is that that doesn't accurately describe the record, because New York articulated one interest for the 2019 change, and that was to comply with the MOVE Act. The... Well, the legislature articulated that, but then the Board of Elections recommended that the governor sign the legislation, and it did articulate this other rationale, right? No, that's inaccurate, too, Your Honor. What happened is the Democratic members of the Board of Elections and the Democratic co-executive director submitted that memo. The Republican member of the Board of Elections and the Republican co-director did not sign on to that memo. Okay, so then you're saying there's a question about whether that's actually what the legislature had in mind. That is. But for purposes of my question, let's just assume that is a purpose of the legislation. Why would that be impermissible? Because of footnote 31 of Anderson v. Celebrezzi, where the Supreme Court says that you can't have a sore loser statute by happenstance, and that's recognized in... that is recognized in Swanson v. Morley. So you're saying that if the New York State legislature adopted this very law, but said explicitly in its findings, the reason we're doing this is because we wanted to serve a sore loser function, that would be okay. But because they didn't say that in the law, it's rendered impermissible. No, I read Anderson differently, Your Honor. Anderson says that you can have a sore loser statute. Which Ohio had. Which Ohio had. Which is why Mr. Anderson did not run on the Republican... in the Republican primary. He withdrew in time to avoid the effects of the sore loser statute. Right. But he had entered... That's what footnote 2 says. Yes. He had entered, but then withdrew. Most other sore loser statutes nowadays make the cutoff at entering the race. But that is... those are the facts in Anderson v. Celebrezzi. But the way I read footnote 31 is that New York can have a sore loser statute if it says we have a sore loser statute. You can't do it by happenstance. Well, New York has chosen a different approach. It doesn't have a sore loser statute, but it requires the independent candidate to get his nominating petitions beforehand. If you want to run on both, you can in New York. Right. You can both seek the primary line and you can seek the independent line. But... And why doesn't that put Anderson in a different light, which is that unlike Ohio, which is going to force you to choose, New York doesn't force you to choose, but it sets up deadlines in order to have these different election choices made in an orderly manner. The answer is because this is about the voters and not the candidate. The candidates are the ones who have to choose. The voters are the ones who are stuck with the choices the candidate makes. But New York has much of an interest in an orderly process for voters, indeed probably more so than it does for candidates. Right. Right. So my question still pertains. Given that New York will let you pick your candidate, I mean, you can sign an independent petition. You can also go and cast a primary vote, right? Or no? Yes, there are no restrictions on that. So you cover all the options that New York gives you to make sure that your candidate is one that on election day you'll be able to vote for? I don't think that addresses the harm to independent voters that Anderson versus Celebresi recognizes. Well, that's different, because in Anderson versus Celebresi, if your candidate lost in the primary, that was the end of it. That's not the case in New York. I think that is the case in New York, because of the deadline. Because the deadline precedes the final. No, you just have to satisfy that deadline beforehand. In Ohio, you couldn't satisfy both. Right. And indeed, if you opted for the primary and lost, you would never be able to be an independent candidate. That's not New York. Right. My answer remains that I don't think that addresses the harm that to the associational rights... What you're saying is that the voter has a right to know who the primary candidate is before the voter decides whether it wants to support an independent candidate. And that I don't... It's certainly not a point discussed in Anderson, and I'm not sure I saw it discussed anywhere else, that there's a right to know who the primary candidate is before you decide whether you want to support an independent candidate. I think that's a fair description of Anderson, Your Honour. The way the Supreme Court approaches Ohio's deadline is to say that voters like my clients have a right to pick a candidate whose positions on the issues respond to those that are developed by the major party candidates over the course of the campaign. Right? So in this case, for example, a candidate who emerged when it became apparent that a far-left candidate was likely to win or could possibly win the Democratic primary. And, Judge Manasseh, I'm not sure I answered your last question about the sore loser... Sure, go ahead. Well, actually, why don't I just... Sir, I've looked up footnote 31, which says that the statute there is a filing deadline, not a sore loser statute. Yes. Ohio has a separate sore loser statute, which is inapplicable to Anderson because he made a timely withdrawal from the Ohio Republican primary. Furthermore, as the Supreme Court observed, it is clear that the statute acts as a disaffiliation provision only by mere happenstance, not by any reasonably discernible legislative design. Right. Isn't that different from our case where there is not a separate sore loser statute and there is a discernible legislative design? I understand that you're saying not everybody signed on to the argument, but certainly before this legislation was signed, the argument was there that this deadline was going to function as a sore loser statute, and that was a feature and not a bug of the legislation. I think that... Well, I know, as we presented our reply brief, that Ohio argued that very point, and the Supreme Court rejected it, and Anderson v. Celebrezzi would have come out the other way if it was okay for a state to use a petition deadline as a sore loser statute. And that has also been recognized by the Eleventh Circuit in the Swanson v. Worley case, and... Okay, I mean, you're citing the case... What I just said, what's the principle? Like, so if the legislature were to say, we're setting this deadline, it's going to have the effect of preventing sore losers from running as independents, and we'd like that, and that's one of the reasons we're adopting it, why would the legislature not be allowed to do that? I think... because it's under-inclusive, I guess, is probably the honest answer I'd have to give. It's under-inclusive. I haven't really looked at it from that perspective. Under-inclusive of what? Because it doesn't stop sore losers, as Judge Reagan points out. Only if you planned in advance, you could be on the ballot. Yes. But why couldn't New York say, well, it's okay if you plan in advance. What we're trying to prevent is the specific situation where somebody runs in the primary, wanting to be a major party candidate, loses and then turns around and tries to be an independent. But if they wanted to be an independent all along, we think that that person is not the kind of sore loser we want to prevent. Right. So I think I would say that no court has ever recognized that narrow interest as anything legitimate or important. I think what Lubin v. Panish... I mean, excuse me, Storer v. Brown recognizes is an interest in political stability that allows a state to prevent sore losers, but not to prevent this very thin-reed category of sore losers who don't plan early enough. Okay. I think we have that argument. You've reserved time for rebuttal, so we'll hear from you again. But let's turn to the appellee, Mr. Gerstein. Good morning, Your Honor. May it please the Court, my name is Charlie Gerstein, Gerstein-Harrow LLP for the appellants, Erie County Board of Elections and its members. In Storer v. Brown, the Court made one holding and one observation that I think are relevant to this Court's disposition of this case. The first is that supporters challenging a ballot access regime must point to the feature of that ballot access regime that actually harms them. And the second is that states may bar sore losers from general election ballots. And that's what this statute here does. And returning briefly to Judge Manashi's last question and my friend Mr. Sells, I think actually New York's fusion voting regime gives the state an especial interest in exactly what it's done here. Voters in the Democratic primary are given the right to know under New York law whether their candidate is committing to the results of that primary or whether the candidate wants to try again on the ballot. In prior years, Byron Brown told Democratic voters, I am also a Working Families Party candidate. I'm also a Conservative Party candidate. If I lose this primary, I will still be on the ballot. And they could evaluate that choice as they saw fit.  that India Walton was on the ballot, he chose not to do that. His supporters chose not to support any other candidate. Every citizen of the city of Buffalo knew since March 25, 2021 who the candidates in the Democratic primary would be. And none of them decided to run as independents. So the only people who disenfranchised the plaintiffs are themselves, Byron Brown, and every other potential candidate of the city of Buffalo, not the state of New York or the defendants. Furthermore, just briefly addressing... So you're saying that New York does have an interest in deciding that somebody who runs in the party primary can't turn around and run as an independent because they should be committed to the primary process. So how do you respond to Mr. Sells' argument that that's under-inclusive because, well, you know, that's not really protecting the integrity of the primary unless it also covers people who plan in advance and decide to hedge their bets against the primary. So I don't think it's under-inclusive. I think what Mr. Sells describes as the narrow slice is what the state of New York may permissively decide to support. Unlike every other state, New York wants candidates to be able to run on multiple ballot lots. Every other state but one, excuse me. New York wants candidates to do that. It has a long history of fusion voting. In an environment where fusion voting is the given background, New York then has an interest in the voters knowing whether they will commit to the party primary or not. It's a different interest, not an under-inclusive interest. There's an interest in states saying, we want the party primaries to be about party primary issues. So you're saying actually the voters who plan in advance and get on other lines are not really sore losers in New York's view or in the county's view. They're people who are just committed to fusion voting. And the true sore losers are the people who lose the primary and want to turn around and run as an independent only then. Correct. Byron Brown, unlike John Anderson, is a true sore loser. He ran, lost, and wanted to get back on the ballot. John Anderson ran, withdrew, and wanted to get back on the ballot. And that's a big difference. I mean, it's a crucial dispositive difference, right? The state may choose to bar sore losers. It's different because John Anderson wanted to be a genuine independent and not see how he fared in the primary first. Is that what you're saying? Whatever it is he wanted to do in other states, there's no question that he had been a Republican congressman for many years. He obviously had some interest in Republican elections in other states and briefly in Ohio. He did not run in the Ohio primary. And the reason that sore loser statutes exist, and this is what Storer v. Brown says, is to prevent the kind of fracturing that would occur if this were permitted. Right? No one would be committed to the party primary process if they knew they could go around and just try again. But why does that fracturing occur also when people plan in advance and get on multiple ballot lines? Oh, because it appears not to in practice. But again, it's a distinct interest that the state of New York, they're not sore losers. They have not actually lost. The voters of the state of New York know when they're voting in a party primary who's going to be on the November ballot and who has a chance to be on the November ballot. They don't get a surprise. Everybody knows on primary election day, India Walton and Mayor Brown were the only people. You're saying the voters don't get a surprise, but, of course, there are voters who, that's another way of saying that they don't get a choice. They don't get the option of the candidacy of somebody who's responding to what happens in the primary and then launching a candidacy. That's correct. So why is the government's interest in preventing a surprise outweigh the voters' interest in getting a candidacy? I think I would just point only to Storer v. Brown. That's the holding of Storer v. Brown. I'm not sure I'm following that. I mean, in Anderson, why isn't it that Mr. Anderson knew he wasn't going to win the Republican primary? And so at that point, the only way he was going to get on the ballot was as an independent, and so he withdrew to avoid the effects of the Ohio sore losers statute. I mean, I'm not sure I understood that your real argument here was that New York, which doesn't have a sore losers statute, has a particular interest in not allowing sore losers to get on the ballot. Am I right? You're not arguing that that's New York's interest here. I think we're arguing that among other interests. How can you argue that when the state does not prohibit sore losers from being on the ballot? It just requires them to hedge their bets by getting an independent candidate line earlier in the process. I think we would phrase it, I would phrase it as Judge Menasche did, which is they're not really sore losers if they plan in advance in this way, right? They've declared in advance and told everyone what their intentions are. But they're hedging their bets in case they lose. Yes, yes. Well, they might be hedging their bets, but I guess you're suggesting they might also be committed to multiple party lines. Like it might be that it's meaningful that somebody is running in the Republican primary but also is a member of the conservative party. Or it's important to Byron Brown that he's not only running as a Democrat, but also as part of the Women's Equality Party because he shares their values as well. So it might not actually be that they're only doing it to hedge their bets, right? That's correct. Well, I understand that for multiple party lines because you want to say I espouse the Democratic Party principles, but I also espouse the principles of these other parties. What I don't understand is how one says I am a Democrat and I'm running on that line and at the same time say I am an independent of these parties and running on that. But New York lets you do it. So what's New York's interest in – that's the problem I'm having with your saying that New York has an interest in preventing sore losers. New York does allow people to hedge on the possibility that they're going to lose. So New York made the policy choice to allow fusion voting for the reason that your honors articulate, which is to give candidates the flexibility to express all variety of political messages. You can say any of the following things on a New York ballot, in effect. I support the Working Families Party and the Democratic Party, and so I identify myself as a farther left than usual Democrat, for example. Or you can say I'm a registered Democrat, I'm running as a Democrat, but I have my own political identity, and no matter what happens, I want to be on the ballot. That's Byron Brown's position. He put his own preferences or his own political ambition above the decision of his party. New York would have permitted him to make that choice. He just had to tell the voters that. So in a world in which New York has made the decision to allow that flexibility, it then has an interest in ensuring that that flexibility is orderly administered. How do you respond to the scenario where a voter doesn't want to decide whether to support an independent candidate until she sees a result of the primary? And under the statutory setup, that can't happen. That's correct. Is that a burden? Is that a sufficient burden? It's not a sufficient burden. It is surely a burden. It's a burden. A voter might prefer that. Why isn't it sufficient? In other words, you can't decide whether to support an independent until you see who wins a primary, and then if you're disappointed, it's too late to then support an independent. So two responses to that under the appellate court case, Your Honor. First, I would just point straightforwardly to the Council of Alternative Political Parties, 2 versus Hooks, the Third Circuit case authored by then-Judge Alito. That was precisely the case there. The filing deadline was on the primary deadline. But even pointing to Graveline versus Benson, which I think is my friend Mr. Sell's strongest case on this point, there's a crucial distinction here in New York. Everybody knew who was running in the Democratic primary for two full months before an independent candidate had to come forward. They didn't know who the Democratic Party chose, but they knew it was possible. There were only two candidates. Anyone paying attention would have noticed that India Walton was doing better than you would have thought, and no one decided to do anything about that fact for two full months, Biden Brown included and his supporters included. So there's no question that it is, or at least we don't question that it's a burden in that, you know, plaintiffs wanted to do this and they were forbidden to do this, but it's an insufficient burden under both the cases that I just cited among many others. And you're saying New York has a special interest in just protecting the integrity of the primary process by saying whoever wins is going to have the line of that party and doesn't get to turn around and add another line. Well, that's not even necessarily the case, Your Honor. I think the interest is in an informed electorate, right? The electorate under New York's judgment and New York's permissible judgment in our view, I see I'm over time. It's okay. Thank you. We went over time with Mr. Sells, so we'll keep asking you questions. Sure. Voter information. So the voters under New York law are given the right to know whether they're voting for someone who commits to the party primary process or does not. And I think it's well within New York's permissible discretion under the First Amendment to decide that that's an important issue. Well, it's not just that they're ensuring that voters know. They're also requiring them to commit to the party process, right? Because you don't get to turn around and run as an independent. They can choose not to. If they plan in advance. If they plan in advance, they can do anything they want, right, anything for which they have sufficient signature support. So you're saying it's kind of a more permissive sore loser law because it allows you, as long as you're up front with the voters in advance, to say, I'm going to maintain an independent candidacy. It just doesn't allow you to turn around after losing the primary and launch one as a surprise. That's correct. And in the Council of Alternative Political Parties case, the second one, the exact interest, and there was a footnote in that case explaining that states may use these deadlines to do exactly this, which is to forbid, but not exactly this, to do something quite like this. But this case presents an unusual, perhaps in somewhat disquieting circumstance, of the person who is the choice of the majority of the voters who wins the election has to do it on a write-in ballot. Surely New York has an interest in having the person who is favored by the majority of the population or whatever the winning percentage of the population is be able to get a candidate on the ballot. Yeah, of course. And you're telling me that actually New York's interest was best served by keeping this gentleman off the ballot. Yes, because he didn't. How? Because he didn't. How is that serving New York's interest when we now know that a majority of the voters wanted him as their designee here or their representative? I think I have two answers to that. The reason that happened is because he didn't seek the many opportunities the state of New York gave him to appear on the ballot anyway. Right? What in fact happened here is not that a majority was disintegrating. The opportunities or the one? Wait. The independent candidate choice. He had in theory an unlimited number of opportunities to appear on the ballot. He had as many opportunities to appear on the ballot as he could get signatures to qualify for. And in the past he appeared as Judge Menasche was listing for more than four other lines. He could have appeared on the Buffalo Party, Working Families, whatever he wanted as long as he had enough signatures to qualify. He chose not to do that. And so the candidate with majority support in the city chose not to run is effectively what happened here. And I don't think the state of New York is obliged to alter its laws for the unusual possibility that the candidate with the majority support in the city chose not to run aggressively in the primary, chose not to seek the alternative ballot lines that he had, waited to see what happened. So the fact that he won a write-in campaign suggests that probably if he put effort into it, he could have won the primary. But it's not New York's job to force people to campaign. And it was a low turnout election. It's hard to know exactly what happened. But it's right. It's not New York's job to force people to campaign. Brown had no obligation to campaign. He just had to accept the result when he didn't. And he chose not to. And his supporters could have coalesced around any number of people so long as they did so. And they had two full months to do that after March 25th when they saw the far left candidate, about which Mr. Sells complains, on the primary ballot, campaigning aggressively, raising a significant amount of money. And they chose not to do that. So I think the state of New York's interest, it has many interests here. And one of them is in an orderly election process that Byron Brown chose not to avail himself of. Well, part of your adversary's argument, as you know, is that the independent candidate requirements are so far out that they're not reasonable. Now, you heard the questioning about how about two weeks, how about the primary day. But they are what they are. Tell us again why you say that New York's interests require them to be that far out for independent candidates. So I want to start by saying the entire calendar was moved with the same relative deadlines in 2019 in response to the MOVE Act litigation, Military and Overseas Voter Empowerment Act. Right, but your adversary says that's 45 days beforehand and this is several months beforehand, five months. Yes, and I think, so we have support in the record, it's in the early 400 pages of the appendix of the testimony. So why is three and a half months before the military ballots have to go out necessary? So I think it's important to note we don't contend, and I don't think there's evidence in the record for the proposition, that New York couldn't have made it later. Right, New York could have made it later. How much later could it have been? Three weeks, five weeks, the record does not reveal. And that's why it's important to note that this is not a strict scrutiny case. That it's not our burden, and that's one of the reasons why below we did not put on evidence in support of the proposition that it absolutely had to be this day. I don't stand here defending the proposition that it couldn't have been a little bit later. And there's no question that it's on the earlier side. That is the point that the state makes in its helpful amicus brief. It's a point we freely concede. It is on the earlier side of states. And I think in response to that, it's very important to note, and this is a point that's only just come up now in argument but is in our briefs, that this is a state election. Right, if this were a federal presidential election, I think there are different questions that would come up here. And this is not, unlike Anderson, a federal presidential election. The state of New York is free to choose early deadlines because it's free to choose early deadlines for their own sake. But there is indeed, you know, there's evidence before the record of a very significant cost savings by moving the primaries so that they didn't have to have a double primary. They wanted to have the earlier candidate, right, for voter education, all the various reasons. And the reason that Judge Monashi brought up that is also in our briefs, which is an affirmative desire to prevent candidacies like Byron Brown's, which is permissible and understandable under the circumstances as well. Can I ask you about the standing question? So it does seem like in your briefing you agree that they have standing. But why would that be the case? So if the injury is that they didn't get to vote for the candidate of their choice, they did get to vote for the candidate of their choice. So I don't quite understand how that is an injury. I take it that if somebody has to run as a write-in and not appear on the ballot, it's less likely the person is going to win. But it can't be an injury to a voter that there's some aspect of the procedure that makes it less likely that their preferred candidate is going to win. Otherwise, you could sue every, you know, over every aspect of the election laws, right? So I heard Your Honor's question to Mr. Sells, and I agree with his answer and want to add one more point to it. So it doesn't strike me as self-evidently obvious that that's wrong, right, in that. That what's wrong, what I just said? Yeah, that someone who has – someone who complains about a feature of a ballot access regime that makes it more difficult for that person's preferred candidate to win doesn't have standing.  I mean, if I think that, like, CNN is giving negative coverage of my preferred candidate and that makes it less likely for that candidate to win, I can sue CNN to say that I've suffered an injury because they're making it less likely that my candidate will win? I think you would lose. You think I would have standing in that case? Probably not, but if the – I'm sorry. So you think that anything that means that my preferred outcome of an election is less likely is an injury to me and I can sue over it? It's hard to say anything, Your Honor, but I think it's important to note, and this was Mr. Sells' point with which the county agrees, is that that was the case in Anderson as to the voters. Yeah, but Anderson himself was a party there, right? So it's not obvious that the standing would – it would have been the same if the candidate himself was not a party here. He's not. Byron Brown sued, right? So we know he's able to sue. There's no reason to authorize third-party standing on behalf of the voters. So it has to be the voters' own injury. So I do see how it's an injury to the candidate not to appear on the ballot and have to run a write-in campaign. I just am sort of perplexed as to why it's an injury to the voter because they do get to vote for the candidate of their choice. So – and my only response is just that my understanding of the standing holdings in Anderson and in other cases is that there must be standing as to each plaintiff in any case. And the judgment would be different if it were dismissed without prejudice on the grounds that there was no standing as to some of the plaintiffs, even if it were affirmed as to Mr. Anderson himself. So – I mean, not quibbling too much with Your Honor's point that it's an unusual theory of standing relative to others. But besides just invoking that fact about Anderson, is there a – the principled argument for why they would have standing is because you think voters suffer injury whenever something happens that makes their preferred outcome of an election less likely? Yes, with one addition. The addition being there is a difference in their associational capacity to specifically want something on a ballot. And again, there's case law in this, right? Like, it's not the specific example, but Anderson, Storer, all of them discuss circumstances in which candidates want – supporters want their candidate's name to appear on the ballot. That's probably a different interest than the CNN example. But as – you know, we don't – I suppose it's worth observing that we don't dispute standing, but we would win an affirmative, right? So you can see I'm making the argument with slightly less force than maybe I otherwise would. And it's in part because the case law does appear clear that they're standing in this circumstance, and that's why we don't disagree with it. But as to what specifically that principled argument would be, I could draw a distinction between the CNN example – and it's unclear to me in the CNN example whether the loss would be because you just have no right as to CNN criticizing your preferred candidate or whether there's an actual Article III standing problem.  Thank you, Your Honor. Thank you very much, Mr. Gerstein. We'll turn it back to Mr. Sills on rebuttal. I think I have a few quick points. I want to first address the Council of Alternative Political Parties argument that Mr. Gerstein mentioned. I read that case in the exact opposite direction. The Justice – now Justice – Alito opinion mentions the interest in preventing sore losers, but it says – the way I read it, it says that New Jersey's law is not narrowly tailored to that interest. That's at 179F3rd at page 80. Mr. Gerstein mentioned the state's interest in having an informed electorate. The Supreme Court rejected that interest to support Ohio's early deadline. In Ohio, they had argued that one needs nine months to inform the electorate about the candidates, and the Supreme Court said not with today's modern technology. And, of course, we've advanced quite a bit in technology, and I don't think the interest in an informed electorate can support a late May deadline for independent candidates as a result. The other interest that Mr. Gerstein mentioned is the orderly election process. As I've mentioned, that's a matter of factual dispute in the record, but it's also one that the Supreme Court rejected in Anderson to support Ohio's early deadline. One doesn't need nine months in that case, six months here in New York, to have an orderly election process to make sure that independent candidates are properly vetted, their petitions are properly vetted, and that they are placed on the ballot in advance of the deadline. What do you have to show to raise a tribal issue on that or a colorable issue? Because it seems to me it's always easy to say, well, they want eight weeks. We think it can be done in seven. We think it can be done in six. I mean, that isn't enough to get you a colorable issue, because the state has given some deference as to how long it needs to run an orderly election. What do you think you showed here that gets you past that, you know, giving them some deference on this? What do you think you showed? Well, first, Judge, I would point out that under the Second Circuit's understanding of the Anderson verdict framework, the state has, or in this case Erie County, has the burden on the second and third pieces, the justification. But what I would focus in on is our deposition of the Erie County elections director and talking about how much time he needs to verify signatures, how many petitions he gets, and so on. And so I'm not sure I would be willing to put a number of days on it, but it's clear from that deposition that the old deadline was working fine and that a deadline much later than the May deadline that is currently in place would also work. Can I ask just something about your argument about underinclusiveness? So which way does that cut exactly? So if you, in fact, are acknowledging that New York's regime allows people to get on the ballot who are sore losers, doesn't that mean that candidates are not actually being excluded from the ballot? And haven't we said really the most important thing in the Anderson verdict is whether there's an exclusion from the ballot or a virtual exclusion? Well, what I would say is that if one's looking at the number of signatures, for example, as in your Libertarian Party of Connecticut case, that would be something you'd have to look at. Mandel versus Bradley says the same thing, that the history of ballot access is important in measuring that kind of burden. And we have some evidence on that here where the early deadline seems to have reduced the number of independent and alternative party candidates who've been able to appear on the ballot, although New York's amicus brief seems to put that at issue with facts that aren't in the record. But I think the other thing I would say about that, again, is that I'm not sure that any court has ever articulated the state's interest in that narrow fashion of having an interest in preventing sore losers who don't plan early enough. No, I get that point. It's just that your response to that was if they really do have an interest in sore losers, then this is under-inclusive because it allows sore losers to access the ballot. And if that's true, then if it allows sore losers to access the ballot, then they just have to plan early enough, then isn't the question whether that amounts to an exclusion of sore losers or independent candidates from the ballot? And if it really is under-inclusive, it means that it's not an exclusion from the ballot. But I guess you're saying that this idea that exclusion from the ballot is the touchstone is really only about the number of signatures. It's not really about this kind of a case. Is that what you're saying? No. And thank you for restating the question in that way. The total exclusion from the ballot here is how it affects people like my clients, like Karlanda Meaders. Their interests are completely excluded from the ballot. So there's a total exclusion from the ballot of candidates who are responding to the primary and want to launch independent candidacies? Yes. Okay. I have that. I have that argument. Yeah. And then can I just ask you to comment a little bit on this exchange we just had about the standing question? So is it your position that a voter suffers an injury in fact whenever something happens that makes it less likely that their preferred candidate will win an election? No, I wouldn't state it that broadly, Your Honor. I think one could have standing if, for example, the state set up rules that systematically disadvantage one kind of candidate versus another kind. And the Supreme Court in Lubin v. Panish, and again in that footnote that I mentioned, footnote 26, I think hones in on the particular disadvantage that comes with being a write-in candidate. So as Mr. Gerstein said — But isn't the particular advantage that comes with being a write-in candidate, isn't that an injury to the candidate? No, I don't think the Supreme Court slices that quite so clearly. There's an overlap between the interests of the candidate in conducting that association through the ballot. And I think that's what Mr. Gerstein was alluding to, that the cases of Lubin v. Panish and Anderson v. Celebrezzi and Williams v. Rhodes all talk about the intersection, the associational intersection between the voter and the candidate that happens on the ballot. So a voter always has the same interests as the candidate, you think? I wouldn't say the same. I wouldn't say identical. But in terms of ballot access issues, they will overlap. They definitely overlap. And I think those three cases stand for that proposition. Okay. Thank you very much, Mr. — May I close with one last point? Sure. Very briefly. I want to say that the search for the state's interest here is not an accident. And the reason for that is because all of that is made up. This was a law written by the Democrats to protect Democratic candidates. And that's why it's hard to articulate a state interest that supports this early deadline. And Anderson v. Celebrezzi stands for the proposition that independent voters like my client have important voices that deserve to be heard unless the state can justify them. And so we would ask this court to vacate the district court's judgment, the magistrate judge's judgment, and remand the case to the district court for further proceedings. Okay. Thank you very much, Mr. Sells.